460 So.2d 1139 (1984)
STATE of Louisiana, Appellee,
v.
Roger James EASON, Appellant.
No. 16648-KA.
Court of Appeal of Louisiana, Second Circuit.
December 5, 1984.
Writ Denied February 15, 1985.
*1141 Robert W. Gillespie, Jr. and John Broadwell, Asst. Dist. Attys., Shreveport, for appellee.
Dimos, Brown, Erskine, Burkett & Smith by George Ross, Monroe, for defendant-appellant.
Before MARVIN, FRED W. JONES, Jr. and NORRIS, JJ.
NORRIS, Judge.
Defendant, Roger James Eason, was charged by bill of information with attempted second degree murder[1] and with armed robbery.[2] A jury found him guilty as charged on both counts. Defendant was sentenced to 25 years at hard labor without benefit of probation, parole or suspension of sentence, on the armed robbery conviction and to a concurrent hard labor term of 15 years on the attempted second degree murder conviction. Defendant now appeals his convictions and sentences, advancing five assignments of error.

FACTS
Defendant and the victim, Sheila Sowell, had known each other for six or seven years. During much of this time they had lived together. Two children were born as a result of their relationship. The victim has a third child who was fathered by a man named Garland Jones. During this third pregnancy the defendant had moved to Iowa to work. Shortly before the child was born, the victim moved to Iowa to be with the defendant. After the birth of the child, the defendant and Miss Sowell had a disagreement and she left the defendant in Iowa and returned to Shreveport to live with her family.
Sometime in November 1982, the defendant also returned to Shreveport. After defendant's return to Shreveport and prior to January 30, 1983, Eason and Miss Sowell had little contact since she was attempting to end their relationship. On January 30, 1983, there was an exchange of telephone calls between the two. The testimony, however, is in conflict as to who called whom and how many calls were made. The victim testified that defendant called her early in the evening and she told him that she would call him back. She called back about 7:00 p.m. and there was a discussion about the couple breaking up, but, according to Miss Sowell, Eason would not accept this situation. At approximately 10:00 p.m. Eason called and informed the victim's sister that he was going to come over. Miss Sowell was on her way to the grocery store with Garland Jones and she declined to wait for Eason to arrive. Defendant arrived at the victim's house while she was gone and was admitted by her sister. Eason played with the victim's third child for a short time. The victim's sister then left the house to pick up her mother from work. Eason left the house sometime between the sister's departure and return. In the meantime, Miss Sowell *1142 and Garland Jones returned from the store. About five minutes after Miss Sowell's sister and mother returned, Eason reappeared at the house.
The victim's mother left defendant in the house and he went straight to the victim's bedroom. Eason then asked Garland Jones, Miss Sowell's mother and sister to allow him to have a private talk with the victim. Her mother left the room, but Jones and the sister remained. Defendant again asked Jones if he could talk to Miss Sowell alone, but Jones refused to leave until Miss Sowell stepped between the two men and requested that he do so. Miss Sowell's sister, however, remained in the room for most of the time while defendant and the victim engaged in what was described by all as a normal, low voiced discussion. During the conversation Miss Sowell admitted that her third child was fathered by Garland Jones and informed the defendant that she no longer wished to carry on their relationship. Suddenly, the defendant produced a .22 pistol and fired five shots at Miss Sowell, striking her in the head and hands. The victim's sister witnessed the shooting and testified that the victim made no threats or threatening actions toward defendant, but only tried to avoid being shot. She testified that the defendant told Miss Sowell that she "didn't deserve to live" just prior to opening fire.
After the shooting, Eason immediately attempted to flee. The victim's other sister and Garland Jones attempted to stop the defendant, but he was able to escape by pointing the gun in Jones' face. Miss Sowell was taken to LSU Medical Center by her mother and her sister where she was treated for gunshot wounds to the head and hands. The treating physician testified that the wounds to the hands were the most serious and that follow up surgery was required to correct the damage caused by the bullets. Miss Sowell testified that she still has one bullet in her head, just behind her left ear and that the other bullet in her head was removed without surgery.
After Eason fled from the house, Miss Sowell's brother and Garland Jones gave chase. They followed Eason to a nearby apartment complex, but abandoned the chase when they saw the defendant apparently attempting to reload his weapon.
Defendant fled to a nearby Kroger grocery store where Cleveland Robertson was parked in his 1973 Olds Cutlass in the parking lot waiting for Ramona Theus to return from the store. Robertson noticed a man pass his car and enter the store. Robertson looked away, and when he looked back, the same man had a gun in his face and ordered him to get out of his car. The man told Robertson he wanted his car and because of the gun, Robertson complied. The man drove off in Robertson's car. Meanwhile, Ramona Theus had exited the store and had observed the events. She recognized the defendant as the culprit because she knew him fairly well. Later, both Miss Theus and Robertson identified Eason from a photographic lineup as the person who took Robertson's car at gunpoint.
The next day, Miss Theus was contacted by the defendant's sister and was told where Robertson's car could be found. She contacted Robertson with the information and the car was recovered. Robertson noticed, however, that two of his credit cards were missing from the vehicle.
Two days later, on February 2, Eason voluntarily surrendered to the Shreveport police. He was charged with attempted second degree murder and armed robbery. He was tried and a jury found him guilty as charged on both counts. Defendant appeals his convictions and sentences, advancing five assignments of error. He claims the trial court erred in allowing two allegedly gruesome and prejudicial photographs into evidence; that there was insufficient evidence to convict him on either charge; and, that the sentences imposed are unduly harsh and excessive.

DISCUSSION: ASSIGNMENT OF ERROR NO. 3
Defendant alleges that the trial court erred in allowing the state to introduce into evidence two allegedly gruesome photographs *1143 of the victim's bedroom which show blood spots and spatters, contending that the probative value of the pictures was outweighed by their prejudicial effect.
The admission of gruesome photographs will not be overturned unless it is clear that the prejudicial effect of the photographs outweighs their probative value. State v. Brogdon, 426 So.2d 158 (La.1983); State v. Perry, 420 So.2d 139 (La.1982); State v. Lindsey, 404 So.2d 466 (La.1981). Photographs which illustrate any fact, shed light upon any fact or issue in the case, or are relevant to describe the person, place or thing depicted are generally admissible. State v. Kirkpatrick, 443 So.2d 546 (La. 1983); State v. Lindsey, supra; State v. Bodley, 394 So.2d 584 (La.1981); State v. Landry, 388 So.2d 699 (La.1980). In this case it was not error for these photographs to be admitted. They are not particularly gruesome and were certainly relevant to show the room where the shooting took place. One depicts a bed that has a pillow with a few blood spots on it. The second picture shows more of the bedroom with a medium size bloodstain and a few spots of blood on the floor. The exhibits complained of do not unduly prejudice the defendant. They serve the purpose of depicting for the jury the layout of the room where the shooting occurred, as it looked at the time of the occurrence. When the probative value of the photographs in depicting the crime scene is balanced with the small possibility of their prejudicial effect on the jury, we find their probative value far outweighs any possible prejudicial effect. State v. Kirkpatrick, supra; State v. Lindsey, supra. This assignment is without merit.

ASSIGNMENTS OF ERROR NOS. 1 & 2
Here defendant contends his convictions were based on insufficient evidence.
The constitutional standard of review for the sufficiency of evidence to support a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Nealy, 450 So.2d 634 (La.1984). The statutory rule as to circumstantial evidence is that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. La.R.S. 15:438. This statutory rule is not a purely separate test from the Jackson standard to be applied instead of a sufficiency of the evidence test whenever the state relies on circumstantial evidence to prove an element of the crime. State v. Wright, 445 So.2d 1198 (La.1984). Ultimately, the Jackson standard is the objective standard for testing the overall evidence, direct and circumstantial, for reasonable doubt. State v. Wright, supra; State v. Sutton, 436 So.2d 471 (La.1983). The statutory rule, however, provides an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found the defendant guilty beyond a reasonable doubt. Exclusion of every reasonable hypothesis of innocence is, therefore, a component of the more comprehensive reasonable doubt standard, where circumstantial evidence is used to convict. Thus, although the circumstantial evidence rule may not establish a stricter standard of review than the more general reasonable juror's reasonable doubt formula, it does emphasize the need for careful observance of the usual standard and provides a helpful methodology for its implementation in cases which hinge on the evaluation of the circumstantial evidence. State v. Wright, supra; State v. Sutton, supra; State v. Chism, 436 So.2d 464 (La.1983).
Defendant first argues that a review of the evidence under the applicable standard does not support a finding of guilty of the offense of attempted second degree murder. Defendant's argument is twofold. First, defendant contends that the state failed to prove he had the required specific intent to kill or inflict great bodily harm. *1144 Secondly, defendant argues that the evidence, at most, only supports a verdict of guilty of the crime of attempted manslaughter.
La.R.S. 14:30.1 defines second degree murder as:
... the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm
La.R.S. 14:27, in pertinent part, defines attempt as follows:
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
Specific intent is defined by La.R.S. 14:10:
Criminal intent may be specific or general:
(1) Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.

* * * * * *
The evidence at trial viewed in the light most favorable to the prosecution reveals that defendant armed himself when he left home to visit the victim. The witnesses present when the crime was committed testified that the victim and defendant did not argue with each other in her bedroom and that she committed no acts of aggression toward him. Although there was evidence that the discussion between the two, at one point, concerned the paternity of Miss Sowell's third child, at no time did defendant appear to be angry, agitated or upset. He carried on a normal conversation with the defendant conducted in a low voice. When the victim turned away from defendant, the testimony is that he stated to her "you don't deserve to live," and shot her at least five times with a .22 pistol. Two bullets struck the victim in the back of her head and several struck her hands as she obviously raised them to protect herself.
In State v. Procell, 365 So.2d 484 (La.1978), the court held that the pointing of a gun at a victim as it was fired, was evidence of a specific intent to kill. Although intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. La.R.S. 15:445.
Viewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found beyond a reasonable doubt that defendant had the requisite specific intent to kill the victim or inflict great bodily harm upon her.
Likewise, we conclude that defendant's attempted manslaughter argument lacks merit. La.R.S. 14:31 provides:
Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed ...
Defendant contends that a rational juror viewing the evidence in a light most favorable to the prosecution must have concluded that defendant was sufficiently provoked so as to deprive him of his self control and cool reflection thus causing him to shoot the victim in a sudden passion or heat of blood.
Defendant points to his mother's testimony that the victim made a series of harassing telephone calls to defendant during the day of the incident and the testimony that the victim admitted, during their discussion *1145 immediately prior to the incident, that her third child's father was Garland Jones, to bolster his argument.
However, his mother's testimony was uncorroborated, unclear, contradicted by the victim and in light of cross-examination, arguably unbelievable. Further, the evidence does not picture defendant at the scene of the crime as one lacking self control and cool reflection.
The evidence most favorable to the prosecution shows that the victim returned an earlier telephone call from the defendant around 7:00 or 8:00 p.m. The victim testified they talked about breaking up and that the defendant had a hard time accepting that fact. The victim stated that the defendant subsequently called her sister and informed her he was coming over. The defendant arrived at the victim's residence around 10:30 p.m. while the victim was at the grocery store, played with the baby, left, and returned about 45 minutes later. According to the victim's sister, he did not appear agitated or angry.
After the defendant returned to the victim's residence, there was no evidence of arguing or fighting between the victim and the defendant nor evidence that defendant was angry, agitated or upset prior to the unexpected shooting.
We conclude that a rational juror certainly could have concluded from the evidence adduced that the shooting offense was not committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Evidently, defendant had enough self control and cool reflection to talk and act normally prior to shooting the victim. Also, as further evidence of the defendant's self control and cool reflection, it is noteworthy that he did not harm anyone else in the house even though he was attacked by one of the victim's sisters and confronted by Garland Jones as he made his escape.
In sum, we conclude that a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have concluded beyond a reasonable doubt that defendant committed the crime of attempted second degree murder.
Defendant further argues that the state failed to prove beyond a reasonable doubt that he had the specific intent to commit armed robbery in that it failed to show that the defendant had a specific intent to permanently deprive the victim of his property.
La.R.S. 14:64 defines armed robbery as follows:
Armed robbery is the theft of any thing of value belonging to another from the person of another or which is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.[3]
La.R.S. 14:67 defines theft as:
Theft is the misappropriation or taking of any thing of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential. [Emphasis added.]
An essential element of the crime of theft is a specific intent to permanently deprive the victim of his property. Since armed robbery is a species of theft, the state must show that the defendant had the intent necessary for the offense of theft. State v. Bruins, 407 So.2d 685 (La.1981). Although intent is a question of fact, it need not be proven as a fact, it may be *1146 inferred from the circumstances of the transaction. La.R.S. 15:445.
We conclude that there was ample evidence from which the jury could conclude under the circumstances of this case that defendant intended to permanently deprive Cleveland Robertson of something of value. Robertson testified that defendant put the gun in his face and ordered him to get out of his car and that when he asked defendant what he wanted, he replied, "the car, now get on out." Even though the car was subsequently abandoned and ultimately recovered by the victim, the actions of the defendant, at the time of the transaction, provide ample evidence of an intent to permanently deprive Robertson of his vehicle. Further, Robertson also testified that two credit cards which were in his car were never recovered. Compare, State v. Meade, 377 So.2d 79 (La.1979).
In Griffin v. State, 614 S.W.2d 155 (Tex. Cr.App.1981), the defendant commandeered a taxicab at gunpoint. A short while later, the defendant was apprehended by authorities and the taxicab was found about a mile away from the place of the apprehension. The defendant was subsequently charged with and convicted of aggravated robbery. On appeal, the defendant argued that the evidence was insufficient to prove that the defendant intended to permanently deprive the owner of the taxicab. The appellate court held that the evidence of intent to deprive was sufficient to support the conviction. The following passage is relevant to the court's conclusion and to the instant case:
Applying this standard to the case before us, we hold that the evidence of intent to deprive was sufficient to support the conviction. Intent to deprive must be determined from the words and acts of the accused. Banks v. State, 471 S.W.2d 811 (Tex.Cr.App.1971). The appellant's argument is that his driving the taxicab only a few miles and leaving it parked on a street while he walked a mile away from it, means that no rational finder of fact could have believed beyond a reasonable doubt that he had an intent to deprive the owner when he took the cab. It must be remembered that the element which must be proved is not a deprivation, but the defendant's intent to deprive at the time of the taking. The fact that the deprivation later becomes temporary does not automatically mean that there was no intent to deprive permanently or for so long as to satisfy the statutory definition. Draper v. State, 539 S.W.2d 61, 68 (Tex.Cr.App.1976). [Footnote omitted.]
The evidence in the instant case, viewed in a light most favorable to the prosecution, does not permit the reasonable inference that, at the time of the taking, the defendant ever intended to return the property forcibly taken but requires the conclusion that defendant was totally indifferent as to whether the owner ever recovered the property or not. The fact that defendant may have subsequently decided to abandon the vehicle, perhaps to avoid detection, does not detract from his initial intent to permanently deprive.
The facts established by the direct evidence and inferred from the circumstantial evidence are sufficient here for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime of armed robbery.
Assignments of error numbers 1 and 2 lack merit.

ASSIGNMENTS OF ERROR NOS. 4 & 5
Defendant appeals as excessive his sentence of 25 years at hard labor, without benefit of probation, parole or suspension of sentence for armed robbery and a concurrent 15 year hard labor sentence for attempted second degree murder. We affirm.
Article I, § 20 of the Louisiana Constitution of 1974 prohibits the imposition by law of excessive punishment. Although a sentence is within statutory limits it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, *1147 367 So.2d 762 (La.1979). However, the sentencing judge is given wide discretion in imposing a sentence within the statutory limits and such a sentence should not be set aside as excessive in the absence of a manifest abuse of discretion by a sentencing judge. State v. Square, 433 So.2d 104 (La.1983); State v. Brooks, 431 So.2d 865 (La.App. 2d Cir.1983); State v. Hammonds, 434 So.2d 452 (La.App. 2d Cir. 1983), writ denied 439 So.2d 1074 (La.1983).
In imposing sentence, the trial judge must comply with the mandatory requirements of La.C.Cr.P. Art. 894.1 and individualize the sentence by stating for the record the considerations taken into account and the factual bases therefor. State v. Jones, 381 So.2d 416 (La.1980). While the trial judge need not articulate every aggravating and mitigating circumstance outlined in article 894.1, the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant. State v. Hammonds, supra; State v. Cunningham, 431 So.2d 854 (La.App. 2d Cir.1983); State v. Smith, 433 So.2d 688 (La.1983). The sentencing guidelines of La.C.Cr.P. Art. 894.1 also provide the criteria to consider in determining whether a sentence is excessive. State v. Sepulvado, supra; State v. Tully, 430 So.2d 124 (La.App. 2d Cir.1983).
The record reflects that the sentencing judge adequately considered the factors enumerated in La.C.Cr.P. Art. 894.1 in imposing this sentence. The penalty for armed robbery is not less than five nor more than ninety-nine years at hard labor, without benefit of probation, parole or suspension of sentence; and the penalty for attempted second degree murder is not more than 50 years at hard labor. In imposing the concurrent sentences of 25 years at hard labor for armed robbery and 15 years at hard labor for attempted second degree murder, the judge noted that the defendant was not entitled to probation, in that a sentence for armed robbery must be served without benefit of probation, parole or suspension of sentence. He noted that the defendant had a prior record of auto theft and receiving stolen goods, and had been on probation earlier, without the desired results. The trial judge stated that since defendant had been convicted of two very serious crimes, a lesser sentence would deprecate the seriousness of these offenses.
In mitigation, however, the judge did note that there was some evidence that the defendant had been provoked in the shooting of Miss Sowell and that he had two children by her, who might suffer some hardship as a result of his imprisonment.
Moreover, we note that the sentences received are less than one-third (1/3) of the maximum possible sentence on each conviction and are being served concurrently rather than consecutively. Based upon the defendant's prior record and the seriousness of the two offenses for which he was convicted, we cannot find the sentences imposed herein to be excessive. They are not so disproportionate to the crimes committed to shock our sense of justice. State v. Bonanno, 384 So.2d 355 (La.1980).
Accordingly, defendant's convictions and sentences are affirmed.
AFFIRMED.
NOTES
[1] La.R.S. 14:30.1 and 14:27.
[2] La.R.S. 14:64.
[3] Act No. 70 of 1983 amended La.R.S. 14:64(A) to read as follows:

Armed robbery
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
We note that under the new amendment a theft, i.e., taking of the property of another with intent to deprive permanently, is no longer required. A mere "taking" will suffice.